**UNITED STATES of America, Plaintiffs,**

v.

**Jose Pedro ZAPATA, Defendant.**

**No. CIV.A. 96–CR–120–B–01.**

United States District Court, D. Colorado.

Feb. 14, 2003.

Kerry Steven Hada, Kerry S. Hada, PC, Englewood, CO, James Eric Fahrenholtz, Fahrenholtz & Carey, Eagle, CO, for Jose Zapata.

Frank Joseph Mackey, III, U.S. Attorney's Office, Denver, CO, for U.S.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

The government charges Mr. Zapata with three counts of possessing cocaine with the intent to distribute and with aiding and abetting the distribution of cocaine under 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2. Mr. Zapata moves to dismiss. The motion is adequately briefed and a hearing was held on February 5, 2003. For the reasons set forth below, I GRANT the motion.

## I. Facts

In 1996, Jose Pedro Zapata ("Mr. Zapata") lived in Apartment A–4 of the Timber Ridge Village apartments in Vail, Colorado. Mr. Zapata lived with, and continues to live with, a wife and daughter. He also has a sister and four brothers: Manuel; Alejandro; Francisco (Mr. Zapata's co-defendant); and Jose Pablo, Mr. Zapata's twin. At times, Mr. Zapata testified, people confused Mr. Zapata with his brothers. Alejandro, for instance, would use his brothers' names as an alias from time to time. During those years, it was not uncommon for Jose Pablo or Alejandro to be in legal trouble.

Also in early 1996, the Vail Police Department continued coordinated efforts with federal agents in an investigation and sting of a suspected cocaine ring in Eagle County, Colorado. The multi-jurisdictional investigators composed a drug task force. Former Detective Michael Stickney of the Vail Police Department, who testified at hearing, was the head of that task force.

The main focus of the task force's investigation was the apartment complex in which Mr. Zapata lived. In March 1996, investigators obtained numerous Colorado state warrants and planned a sweep of the Timber Ridge Village apartment complex. Mr. Zapata was among those the task force suspected of distributing cocaine. The state warrant for Mr. Zapata's arrest, along with the many other warrants for the sweep, issued March 15, 1996. The task force did not initially place any of the warrants into the NCIC or CCIC system because it did not want to alert those living at the apartment complex of the planned sweep.

Among those arrested during the previous months was Mr. Zapata's co-defendant and brother Francisco Antonio Zapata Parra, arrested February 28, 1996. The Timber Ridge Village apartment sweep began the evening of March 17, 1996 and continued until the next morning. The sweep resulted in thirty-eight arrests. Mr. Zapata, however, was not found during the sweep.

Nor did the task force expect to find him there. Two confidential informants on which the task force had relied throughout the investigation notified it that Mr. Zapata fled to Mexico before the sweep. Those two informants, Mr. Stickney testified, were as reliable as any with whom he had worked in his fifteen years of experience. The informants told investigators that someone named "Connie" had driven Mr. Zapata to Denver where he took a bus to Mexico.

After the sweep, the task force disbanded. Apparently due to oversight, neither federal nor local agents placed the one remaining unexcuted state warrant from the task force investigation—that for Mr. Zapata—into the NCIC or CCIC systems. Accordingly, his warrant remained at large but without placement in either system.

On March 19, 1996, the criminal complaint for this case was filed based upon an affidavit by Detective Stickney and a federal warrant issued for Mr. Zapata's arrest. That warrant was never placed into the NCIC or CCIC systems either. On March 21, 1996, a Grand Jury returned an indictment based upon that criminal complaint. Mr. Zapata's co-defendants, Francisco Antonio Zapata Parra and Luis Enrique Esparsa, entered plea agreements with the government shortly thereafter.

Five years later, Mr. Zapata was arrested for Driving Under the Influence on February 8, 2001, in Eagle County. The warrants for his arrest in the present case were still not in the NCIC or CCIC system at that time. Eventually, Detective Craig Bettis of the Vail Police Department investigated recent complaints alleging Mr. Zapata's use and distribution of co-

caine. After reviewing files from the 1996 task force investigation, Detective Bettis discovered that Mr. Zapata had not been arrested previously for the charges at-issue here. On August 1, 2002 Mr. Zapata was finally arrested for the 1996 charges. Mr. Zapata testified to having no knowledge of the indictment prior to that arrest.

At hearing, Mr. Zapata testified that he worked and resided in the Vail Valley when the sweep occurred and that he has continued to do so since then. For evidence, he produced copies of four pay stubs from the Vail Athletic Club for periods of employment ending March 3, March 17, July 7, and August 4, 1996. The pay stub for the period ending March 17 shows payment for 80 hours at normal pay and 32.77 hours of overtime. Mr. Zapata also provided copies of a Vail Valley Medical Center bill for hospital services provided for his daughter when he and his wife took her there on March 18, 1996. Additionally, he provided a receipt of an insurance refund from the Vail Athletic Club for $204.89 dated May 3, 1996 and a receipt for a bonus in the amount of $330 dated April 29, 1996. Mr. Zapata testified to picking up both payments in person.

Mr. Zapata also produced joint tax returns for 1996 through 2001. The couple's adjusted gross income increased each year from a 1996 total of $25,783 to $57,512 in 2001. With the exception of 2001, each tax return—filed jointly with his wife Maria Lourdes Zapata—includes W–2 forms that show several sources of income from businesses located in the Vail Valley. For instance, in 1996, Mr. Zapata's W–2 forms reported income from the Roost Lodge and Vail Athletic Club in Vail, and from The George in Avon, Colorado. A W–2 form for Mrs. Zapata indicates that she worked at the Holiday Inn in Vail in 1996.

Their tax returns show similar sources of income between 1997 and 2000. In those years, Mr. And Mrs. Zapata worked at numerous locations including the Vail Athletic Club; Roost Lodge; Lion Square Lodge; Zino Ristorante; Michaels American Bistro; the Shops at Eagle Interchange; Vail Associates, Inc.; the Chateau at Vail; PJ Long Run, LLC; Chimayo Grill; SOS Staffing Services; the Vail Corporation; and Sonnenalp Properties Inc. With one exception—the Red Lion Tea, Inc.—the W–2 forms list the address of every employer to be in Vail, Avon, Edwards, or Eagle, Colorado. Each town is located along Interstate 70 in or near the Vail Valley.

In addition to these tax records, Mr. Zapata provided the Court with three copies of leases for his residence in the Timber Ridge Village apartments. The leases run consecutively from August, 1994 and end with notice of the last lease's termination on October 31, 1996. Mr. Zapata testified that, since then, he has lived in a trailer owned by his brother-in-law located in Edwards, Colorado. Mr. Zapata showed the Court copies of an alien registration receipt card, a resident alien card, and a Colorado driver's license.

## II. Motion to Dismiss

Mr. Zapata moves to dismiss the charges against him, asserting a violation of his Sixth Amendment right to speedy trial and Fifth Amendment due process right to a fair trial. Because he moves for consideration of both rights under *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) and its progeny, and because his challenge is premised upon post-indictment delay, I consider his arguments in the context of the Sixth Amendment right to speedy trial under *Barker*.

### A. Sixth Amendment Right to Speedy Trial

■ The right to a speedy trial is a fundamental right secured by the Sixth Amendment to the Constitution of the

United States. Determining whether a defendant's Sixth Amendment right to speedy trial has been violated requires a four-factor balancing test enunciated by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *see also United States v. Gomez,* 67 F.3d 1515, 1521 (10th Cir.1995). The four factors are: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the delay prejudiced the defendant. *Gomez,* 67 F.3d at 1521; *Barker,* 407 U.S. at 530, 92 S.Ct. 2182. None of the four factors is necessary or sufficient to the finding of a deprivation of the right of speedy trial. *Gomez,* 67 F.3d at 1521. Rather, the four factors should be considered together with such other circumstances as may be relevant. *Id.* (citing *United States v. Kalady,* 941 F.2d 1090, 1095 (10th Cir.1991)).

### 1. The Length of Delay

The length of delay is a threshold factor. *Gomez,* 67 F.3d at 1521. Only if the delay is presumptively prejudicial should I inquire into the remaining factors. *Id.* Generally, the speedy trial right attaches when a defendant is arrested or indicted, depending on which is first. *United States v. Muniz,* 1 F.3d 1018, 1024 (10th Cir.1993); *United States v. Marion,* 404 U.S. 307, 320–21, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). "[T]he presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett v. United States,* 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). "Depending on the nature of the charges, [ ] courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Id.* at 652 n. 1, 112 S.Ct. 2686.

The government filed its indictment on March 21, 1996. Mr. Zapata was arrested for charges in this case on August 1, 2002—more than six years later. I find and conclude that six-year delay is a presumptively prejudicial length of time.

### 2. The Reason for the Delay

The government contends that Mr. Zapata is at fault for the delay because he absconded to Mexico before authorities were able to arrest him in connection to the 1996 drug charges. Mr. Zapata meanwhile asserts that he was in the Vail Valley at the time of the sweep and has lived there since. He contends that the delay is a result of the government's failure to enter the warrants for his arrest into the NCIC or CCIC systems.

To begin, I find that Mr. Zapata did not abscond to Mexico. Mr. Zapata testified credibly that he did not go to Mexico in March 1996. He provided the Court with W–2 slips that evidence his work in the Vail Valley until mid-March, 1996. He produced a bill for his daughter's hospital stay on March 18. Mr. Zapata also showed the Court a bonus receipt for work at the Vail Athletic Club, dated in April 1996, and an insurance refund receipt dated May 3, 1996. Mr. Zapata testified to picking up both in person. The W–2 slips then resume in July 1996.

The government, meanwhile, provides only hearsay and circumstantial evidence in support of its contention that Mr. Zapata fled to Mexico at that time. In hearing, Mr. Stickney testified that two reliable confidential informants told task force investigators that Mr. Zapata planned to flee to Mexico in February 1996. One of those confidential informants later told Mr. Stickney that a woman named Connie had assisted Mr. Zapata by driving him to Denver where Mr. Zapata took a bus to Mexico. Even assuming the confidential informants identified the correct brother— the weight of that evidence is less persuasive than Mr. Zapata's credible testimony backed by documentary evidence.

Second, even if Mr. Zapata did go to Mexico in March 1996, the government still had ample opportunity to pursue his arrest. Mr. Zapata's W–2 forms show that he resumed work in the Vail Valley in July 1996. Mr. Zapata consistently reported his taxes and maintained a residence in the same area for the next six years. His wife and daughter remained with him in the area. Thus, if any investigator had made any effort at all to search for Mr. Zapata, they would have found him in short order.

Even without pursuing him, the simple act of placing the warrants for Mr. Zapata's arrest into the NCIC or CCIC systems would have significantly improved the chances Mr. Zapata's arrest. Instead, Mr. Zapata's case remained entirely unpursued while Mr. Zapata continued living and working within miles of the original focus of the investigation. Even had Mr. Zapata initially absconded, the government is at fault for the delay between July 1996 and August 1, 2002. That time frame represents a vast majority of the delay in this case.

Third, and most convincing, is the *reason* the government proffers for the delay in pursuit of Mr. Zapata. In reliance upon information obtained from two confidential informants, the task force simply assumed that Mr. Zapata had fled to Mexico. The government did not knock on Mr. Zapata's known residence. It did not track or interview Mr. Zapata's family. Nor did it in any other manner continue to investigate Mr. Zapata's whereabouts after the March 17 sweep. Rather, apparently satisfied with its 38 arrests, the task force disbanded. Given Mr. Zapata's continued work and residence in close proximity to the original investigation, law enforcement agents could have arrested him with little effort. In failing to take those reasonable steps to pursue and arrest Mr. Zapata, the government was grossly negligent.

In sum, I find that Mr. Zapata did not flee to Mexico after the arrests in 1996. I further find that even had he fled to Mexico during that time, his presence in the Vail Valley beginning in July 1996 gave the government ample opportunity to pursue its case. Instead of taking even minimal steps in pursuit, the government relied on the word of two confidential informants and failed to place the warrants for Mr. Zapata's arrest into the NCIC or CCIC systems. This delay is therefore attributable to the government's gross negligence.

### 3. Whether the Defendant Asserted His Right to Speedy Trial

Where a defendant knows of the indictment against him and asserts a right to speedy trial only years afterward when arrested, the third factor "would be weighed heavily against him." *Doggett,* 505 U.S. at 653, 112 S.Ct. 2686.

The government contends that Mr. Zapata knew of his indictment in 1996 after the sweep. In support of that proposition, government counsel cites the fact that Mr. Zapata's pay stubs temporarily stopped at approximately the same time as the sweep, the fact that the sweep took place in the apartment complex where Mr. Zapata lived, and the fact that Mr. Zapata's brother was arrested in the sweep. That evidence, however, shows nothing more than Mr. Zapata's likely knowledge that the sweep and arrests *occurred.* In no way—without presuming Mr. Zapata's guilt—does that circumstantial evidence show that Mr. Zapata knew that *he was a suspect.*

At hearing, Mr. Zapata credibly testified that he had heard of the arrests, but the only person he knew personally to be arrested was his brother, Francisco, who was arrested February 28, 1996, well *before* the sweep. He testified that he did not know of his indictment and arrest warrant until

his arrest for the present charges in August 2002.

In sum, I cannot find that he had knowledge of his indictment, especially in light of his testimony stating otherwise. Because I find no knowledge on behalf of Mr. Zapata of his own indictment, he "is not to be taxed for invoking his speedy trial right only after his arrest." *Doggett*, 505 U.S. at 654, 112 S.Ct. 2686.

Mr. Zapata was arrested for the current charges on August 1, 2002. He asserted his right to speedy trial in a motion filed January 29, 2003. I find and conclude that Mr. Zapata asserted his right to speedy trial in a timely manner.

### 4. Whether the Delay Prejudiced the Defendant

█ I analyze the final factor in terms of three interests: "preventing oppressive pretrial incarceration; minimizing concern and anxiety to the defendant; and limiting the possibility that the defense will be impaired." *Gomez*, 67 F.3d at 1522. Because Mr. Zapata was not incarcerated in the years between his indictment and arrest, and because he has successfully asserted that he did not know of his indictment, only the third interest applies.

"Of these forms of prejudice, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Doggett*, 505 U.S. at 654, 112 S.Ct. 2686 (internal quotation omitted). Mr. Zapata asserts that the delay has impaired his defense to the charges at issue because had he been arrested shortly after indictment, he could have demonstrated that the correct suspect was his brother and not him. In the alternative, he contends that under *Doggett* he need not establish prejudice anyway.

As is frequently the case, it is difficult to determine whether the delay would have prejudiced Mr. Zapata or the government

in this case. The *Doggett* Court recognized the likelihood that determining such prejudice would be difficult, and directs courts to:

recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay. *Doggett*, 505 U.S. at 655–56, 112 S.Ct. 2686 (internal citations omitted).

Therefore,

[w]hen the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, and when the presumption of prejudice, albeit unspecified, is neither extenuated as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief. *Id.* at 658, 112 S.Ct. 2686 (internal citations omitted).

The six-year delay in the present case has created a strong presumption of prejudice. I have found that prejudice not to be extenuated by Mr. Zapata's acquiescence. The government has not persuasively rebutted the presumption that Mr. Zapata's defense is prejudiced.

Instead of rebutting that presumption, the government contends that *Doggett* does not apply to Mr. Zapata because Mr. Zapata knew of the indictment that was issued for him. Accordingly, it argues, Mr. Zapata's failure to show convincing evidence that he would suffer prejudice is fatal to his motion. The government's contention fails as a matter of fact and law. As noted above, the evidence presented at hearing indicates that Mr. Zapata did not know of the indictment until his arrest on

August 1, 2002. Moreover, even if he had such knowledge, the government presents no authority for the proposition that *Doggett* does not apply if a defendant knows of his or her indictment. Rather, a close reading of *Doggett* reveals that a defendant's knowledge of an indictment is to be considered under the *Barker* factors, discussed above. *See Doggett,* 505 U.S. at 653, 112 S.Ct. 2686.

Moreover, there is some evidence of actual prejudice here. Memory does fade over time. Indeed, Mr. Stickney himself testified that it was difficult to recall the events in question because they happened so long ago.

In light of the six-year delay, the lack of government diligence in prosecution of Mr. Zapata, Mr. Zapata's lack of knowledge about his indictment, and the prejudice I must presume will fall upon his defense, I find and conclude that the government has violated Mr. Zapata's right to speedy trial under *Barker* and the Sixth Amendment. I grant Mr. Zapata's motion to dismiss. Accordingly, IT IS ORDERED that:

(1) Mr. Zapata's motion to dismiss is GRANTED.